UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ORIGINAL

04 CR 10031 WGY

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. |
| v. | VIOLATIONS: |
| | 18 U.S.C. §1341 (Mail Fraud) |
| | 18 U.S.C. §1343 (Wire Fraud) |
| JAMES E. REID | 18 U.S.C. § 2 (Aiding and Abetting) |
| Defendant | |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

1. At all times material to this Indictment, defendant James E. Reid ("Reid") was a sales executive with a software company by the name of Firepond, Inc. ("Firepond") Reid was a resident of Waterloo, Ontario.

2. At all times material to this Indictment, Firepond was a company that developed and licensed software for manufacturers of heavy machinery, such as tractors, helicopters, locomotives and airplanes.

3. At all times material to this Indictment, Firepond's corporate headquarters were located in Waltham and its principal place of business was in Minneapolis, Minnesota. Firepond was a publicly traded company, with its shares traded on the NASDAQ stock market.

4. Reid was hired by Firepond as a sales executive in March 2001 with responsibility for the northeastern United States and Canada. In February 2002, Reid was promoted to the position of Acting Vice President of Sales for North America. Reid was paid a commission of 9% of the total value of the sales that he closed, on top of an annual base salary of approximately $150,000.

## The Scheme to Defraud

5.  From March 2001 until June 2002, when he was terminated, Reid engaged in a scheme to defraud Firepond by fabricating sales contracts with three Firepond customers in order to collect commissions on such sales and to continue to receive his salary and benefits from Firepond. Reid engaged in a pattern of deceptive conduct, such as using imposters and arranging meetings that ended up not occurring, in order to deceive Firepond's senior management and other employees that the sales contracts he had supposedly negotiated were genuine. Reid's three bogus sales agreements were with the following companies: Bombardier, Joy Mining and ABB. These three "sales" were the only deals that Reid closed during his fourteen months as a Firepond sales executive.

6.  The three bogus sales agreements Reid concocted through this scheme totaled over $4.8 million and would have generated over $434,000 in commissions for Reid. Reid's scheme to defraud was exposed after he received approximately $156,000 in commission payments from Firepond.

### Fraudulent Bombardier Contract

7.  At all times material to this Indictment, Reid falsely reported to Firepond's President and CEO ("Firepond's CEO") that he was engaged in active negotiations with high level officials at Bombardier, a Montreal-based manufacturer of large machinery and transportation equipment, such as helicopters and railroad cars. Reid repeatedly lied to Firepond's CEO concerning the status of these discussions, falsely claiming that a substantial sales contract was progressing.

8.  In November 2001, when Firepond's CEO told Reid he wanted to become directly involved in closing this significant sale, Reid agreed to arrange a meeting for Firepond's CEO

with a high-level Bombardier executive. Firepond's CEO traveled to Montreal for this meeting, but upon arriving Reid advised him that the Bombardier official had been called out of town unexpectedly.

9. Reid allayed any concerns arising out of the aborted November 2001 meeting by producing a signed sales agreement between Firepond and Bombardier on December 19, 2001. The total value of this contract was roughly $3.4 million. The Bombardier contract was supposedly signed by the President of Bombardier's Aerospace Division. In reality, as Reid knew at the time, Bombardier had not agreed to any such contract and the sales agreement Reid presented to Firepond contained a forged signature.

10. As a result of this supposed sale to Bombardier, Reid was due a commission of $313,393. Reid was paid approximately $156,000, roughly 50% of the commission due, at the time the executed contract was received by Firepond.

11. At all times material to this Indictment, Reid expended significant efforts to prevent Firepond from discovering that the Bombardier deal was a sham. Reid repeatedly staved off efforts at Firepond to commence implementation of its software at Bombardier by claiming that two different divisions of Bombardier, Transportation and Aerospace, were engaged in an internal dispute over which one would be allowed to implement the Firepond software first.

12. When Reid was pressed to commence implementation, he arranged a "kick-off" session between Bombardier representatives and members of Firepond's Professional Services Organization, which works with customers to implement Firepond software. Six Firepond employees spent hours preparing for this meeting and waited all day for the Bombardier representatives, who never arrived. In order to allay any concerns about this cancelled meeting,

Reid then arranged for someone to call one of Firepond's PSO members and apologize for not making the meeting.

13. As pressure mounted on Reid to obtain payment from Bombardier on the outstanding invoices related to this contract, Reid arranged to have a woman pose as "Lise Benoit," Bombardier's Chief Information Officer at the Special Projects Accounting Office. Reid provided Benoit's name and address to Firepond's CFO so that she could send copies of the contract, invoices and other documents directly to her in April 2002. Reid also arranged a conference call between himself, Benoit and Firepond's CFO on April 29, 2002. In this call, a person claiming to be Lisa Benoit, Bombardier's Chief Information Officer for Special Projects, confirmed that she had received the package from Firepond's CFO and that Bombardier intended to pay the outstanding invoices.

14. The following day, Reid contacted Firepond's CFO at her office in Waltham and asked her whether Firepond had received payment from Bombardier.

15. By mid-May 2002, Firepond's CEO and Firepond's CFO were increasingly concerned that no payment had been received from Bombardier despite Reid's repeated assurances that payment was forthcoming. Firepond's CEO insisted that he personally speak with Bombardier's Chief Operating Officer ("Bombardier's COO") in order to receive assurance from a high-level Bombardier executive that it would pay the outstanding invoices. Firepond's Board of Directors was scheduled to meet later in May 2002, and Firepond's CEO knew that the aging Bombardier receivable would be a topic of interest to the board.

16. Reid advised Firepond's CEO that arranging a call with Bombardier's COO would be difficult since that official was traveling in Australia. When Firepond's CEO insisted, Reid arranged a conference call to Firepond's CEO's Florida home on Sunday night, May 19,

4

2002, at 10:00 p.m. Firepond's CEO spoke that evening to an individual whom Reid introduced to him as Bombardier's COO. The individual with whom Firepond's CEO spoke that evening was conversant in the details of the Firepond-Bombardier contract and technical industry terminology. During this call, the person claiming to be Bombardier's COO was also familiar with Firepond's CEO's interest in Formula One race cars and invited Firepond's CEO to visit Bombardier's hospitality tent at the upcoming Formula One races in Montreal. Firepond's CEO was confident following this phone call that the Bombardier deal was on track.

17. Within a few days of his conversation with Bombardier's COO, Firepond's CEO sent an email message to Bombardier's COO thanking him for taking the time to speak with Firepond's CEO and confirming that Bombardier intended to make payment shortly on this contract. The reply email message from Bombardier's COO stated that he had no recollection of any phone call with Firepond's CEO and there was no contract between Bombardier and Firepond.

18. When he was confronted by Firepond's CEO about the email message received from Bombardier's COO and the fraudulent nature of the Bombardier contract, Reid asked Firepond's CEO to give Reid a "few days" so he could "fix" the problem.

### Fraudulent Joy Mining Contract

19. In the midst of addressing the mounting concerns about the Bombardier deal, Reid was also purportedly negotiating a contract with a central Pennsylvania manufacturer by the name of Joy Mining. At the end of April 2002, Reid presented Firepond management with a signed $450,000 contract between Joy Mining and Firepond. As Reid knew, Joy Mining had not entered into any sales contract with Firepond and the signature on this agreement was forged.

20. The $450,000 Joy Mining contract entitled Reid to a $40,000 commission. Before that commission check was paid by Firepond, suspicions arose about the legitimacy of the Joy Mining deal when Firepond's PSO employees visited Joy Mining in May 2002. These employees discovered that the Joy Mining representatives did not believe a contract had been signed with Firepond, as the PSO staff had been advised.

21. Later that month, as the concerns about Bombardier were mounting, Firepond's CEO contacted Joy Mining about this supposed sales agreement with Firepond. The Joy Mining official stated that there was no signed agreement with Firepond.

### Fraudulent ABB Contract

22. Reid advised Firepond's CEO and others in Firepond management that he was negotiating with ABB, an international automation technology company, to expand on ABB's existing license agreement with Firepond and allow ABB to deploy 1,000 more users of Firepond software.

23. On April 30, 2002, Reid presented Firepond management with a $900,000 sales contract from ABB providing for an expansion of ABB's licensing rights. As Reid knew, the signature of the ABB employee on this contract was forged and he had not reached any agreement with ABB to expand its licensing rights from Firepond.

24. The $900,000 contract with ABB entitled Reid to a commission of $81,000. Like the Joy Mining "sale", however, Firepond discovered that this contract was a fraud before Reid received his commission check.

## COUNT ONE
### (Mail Fraud - 18 U.S.C. §1341)

THE GRAND JURY FURTHER CHARGES THAT:

26. Paragraphs 1-24 are realleged and incorporated by reference as though fully set forth herein.

26. On or about the date set forth below, in the District of Massachusetts and elsewhere, the defendant,

### JAMES E. REID

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to do so, did cause persons to place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the United States Postal Service or by private or commercial carrier, and caused to be deposited matters and things to be sent or delivered by the United States Postal Service or by a private or commercial interstate carrier, and took and received therefrom such matters and things, and knowingly caused to be delivered by the United States Postal Service mail or by private or commercial carrier according to the directions thereon, such matters and things, as follows:

| COUNT | DATE (on or about) | MATTER MAILED |
|---|---|---|
| 1. | 4/24/02 | Letter and documentation sent by Firepond's CFO to Lisa Benoit, purportedly the CIO of Special Projects Accounting Office at Bombardier; |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS TWO THROUGH TEN
### (Wire Fraud - 18 U.S.C. §1343)

THE GRAND JURY FURTHER CHARGES THAT:

27. Paragraphs 1-24 are realleged and incorporated by reference as though fully set forth herein.

28. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

JAMES E. REID

and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as follows:

| COUNT | DATE (on or about) | MATTER WIRED |
|---|---|---|
| 2. | 12/19/01 | Executed sales agreement between Bombardier and Firepond, faxed to C.M. at Firepond's Waltham, MA office; |
| 3. | 2/19/02 | Reid e-mail message to J.T. and M.W. re: Wiring Info for Bombardier; |
| 4. | 3/5/02 | Reid e-mail message to M.W. and A.C. re: Bombardier FTC; |
| 5. | 3/19/02 | Reid e-mail message to C.M. and Firepond's CEO re: Joy Mining Agreements; |
| 6. | 4/22/02 | Letter from S.V. of Bombardier to Reid that was faxed to Firepond's CFO; |

| | | |
|---|---|---|
| 7. | 4/29/02 | M.W. e-mail message to Reid, C.M., M.R. and Firepond's CFO re: Signed Contract for Joy Mining; |
| 8. | 4/29/02 | Telephone call between Reid, Lise Benoit and Firepond's CFO re: receipt of Firepond's documents and payment by Bombardier; |
| 9. | 5/7/02 | M.W. e-mail message to Reid re: Jim Reid Area – 4.30.02.xls - commissions; |
| 10. | 5/16/02 | Reid e-mail message to M.D., Firepond's CFO, and Firepond's CEO re: Bombardier Meeting; |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Joshua S. Levy
Assistant United States Attorney

Date:   February 5, 2004

DISTRICT OF MASSACHUSETTS          February 5, 2004

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk

12:25P

9